THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALEXANDER McLAREN, Defendant-Appellant.

First District (5th Division)    No. 78-1299

Opinion filed October 12, 1979.

Richard W. Stopka and Harry Missirlian, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

After a bench trial, defendant Alexander McLaren was found guilty of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and was sentenced to a term of 20 to 30 years. The issues presented for review by defendant are whether: (1) he was proved guilty beyond a reasonable doubt; (2) the court erred in allowing two witnesses to assert fifth-amendment privileges against self-incrimination; (3) the court erred in not calling the same two witnesses as court's witnesses; and (4) the sentence of 20 to 30 years was excessive.

The following pertinent evidence was adduced at trial.

*For the State*
*Donald Bridges*

He is an 18-year-old student. He and James Martinez, a 16-year-old at the time of the incident, left a restaurant at 26th and Kedzie in Chicago at 3:30 a.m. on June 2, 1974, intending to get on a bus. As they walked along the street, they noticed a group of people standing near a liquor store. The group consisted of several Latinos and one white man subsequently identified as the defendant. As they approached the group, defendant remarked to Bridges, "Hey, Nigger, what are you going [*sic*] around here." Several more remarks were exchanged and then defendant said, "Get your shit, man; get your shit." Bridges said the expression meant to

get a gun. Bridges told Martinez to run and he himself ran south on Kedzie. When he was about one-half block away, someone hollered that it was all right to come back. A couple of minutes later, he heard several shots fired and he saw a body lying on the ground. He flagged down a police car and was driven to the scene where he discovered that the body was James Martinez.

*Lorenzo Rendon*

On June 1, 1974, he was in the B & A Tap located between 23rd and 24th Streets on South Kedzie. Jorge Roman, Juan Perea and the defendant were also in the tavern. He had previously known defendant for about three months and Roman and Perea for about six months before the shooting. Rendon testified that while he was playing pool in the tavern he heard a shot. He turned and saw defendant pointing a gun at a security guard named Bennett. When defendant ordered Bennett not to move Bennett remained seated on a bar stool. About 1:45 a.m. he, Perea, Roman and defendant went outside and stood around drinking beer.

About an hour later, two people, a Puerto Rican and a black, passed by on the sidewalk. Defendant said, "Say, Nigger, where are you from." Responding to Roman's question, the Puerto Rican said, "I live at 26th and Sawyer." Roman said, "He's just a punk." Then defendant said, "Get the shit," and Randon saw defendant bend down and start firing. He saw the Puerto Rican lying on the sidewalk. They attempted to run away, but Roman, who had been shot in the leg, said that if the police came he should tell them the shots were fired from a black Cadillac that passed by. Rendon told this story to the police, but later told them that defendant had done the shooting.

On cross-examination, Rendon testified his only contact with Roman and Perea were at the tavern. He stated that both Roman and Perea were members of the Latin Kings, but denied he was. However, at the preliminary hearing, he testified that both Roman and Perea had been in a social club longer than he had and when asked to name the organization, he replied, "Latin Kings."

*William Bennett*

He was a licensed private detective, and on June 1, 1974, his offices were above the B & A Tap. About 9:30 p.m. on June 1, 1974, a shot was fired next to his head as he sat in the bar. He whirled around and saw defendant standing in front of him, pointing a gun at him, saying, "Don't move, hold it." At that time Roman and Perea got between himself and defendant, and Roman told defendant to "cool it."

About 3:15 a.m. he heard seven or eight shots fired in rapid succession outside the tavern and ventured outside with his gun drawn. He saw the victim lying on the sidewalk and Jorge Roman hopping around with blood on his right leg. Bennett saw defendant put something in his belt as

he was crossing the street about 30 or 40 feet away. When he flagged down a police car after the shots were fired, he told the police that he thought defendant had done it.

Bennett said he believed that Rendon, Roman and Perea were all members of the Latin Kings. This was based on overhearing their conversations and on what other people told him.

It was stipulated that if Dr. Stein were called, he would state the cause of the victim's death was a bullet wound to the back penetrating the left iliac artery.

It was also stipulated that on February 2, 1975, eight months after the instant crime took place, the body of Benjamin Rodriguez was found at the rear of the premises at 2327 South Sawyer in Chicago, which is one block west of Kedzie. The bullet removed from the body was determined to have been shot from the same gun as were the bullets that killed the victim in this case. However, the weapon was not recovered. Jorge Roman and another man were charged with the murder.

Defense counsel requested that the court call Juan Perea and Jorge Roman as court's witnesses because they would be antagonistic to the defense and defendant could not vouch for their credibility. The court stated it was premature to do so because no antagonism had been shown.

### For the Defendant

#### Jorge Roman

He was at the B & A Tap and was shot during the early morning hours of June 2, 1974. He invoked the fifth amendment with respect to other questions, including whether he knew who shot him.

#### Juan Perea

Jorge Roman was married to the sister of Perea's wife. Perea stated that both he and Roman were members of the Latin Kings. When asked if he was present at the B & A Tap on June 1, 1974, whether he witnessed the shooting outside the tavern, or if he were a participant in the shooting, he invoked his fifth-amendment privilege against self-incrimination. When he invoked the fifth amendment with respect to several other questions, defense counsel asked that the State give the witness immunity, but the assistant State's Attorney refused this request.

#### Alexander McLaren, on his own behalf

He had lived in the neighborhood of the B & A Tap for more than a decade and he frequented that tavern. He said the Latin Kings were in that area, and he knew that Rendon, Perea and Roman were all members.

On June 1, 1974, he went to the B & A Tap in the early afternoon and had several drinks with Roman, Perea and Rendon. He first saw the gun in the early evening hours when the bar owner, Perea and Roman were

passing it around. Defendant said that he fired the gun in the air after receiving it from Roman, but he did not attempt to shoot anyone. After defendant fired the shot, Bennett went behind the bar, and Roman and Perea stepped between them. Defendant said that he then gave the gun to Roman, who gave it to Perea. Defendant then stayed in the tavern for about 45 minutes to an hour, drinking with the others. When the tavern closed, they bought beer and went outside. At that time defendant saw Perea put the gun in a paper bag and place it by the curb.

After they had been standing outside for one-half hour, the victim and Bridges walked by. Defendant said he could have had a conversation with them, but he did not recall. He did remember seeing Bridges run south and the victim talk to Roman and Perea. Defendant said he yelled to Bridges to come back, and then heard shots being fired. Defendant said he put a quart of beer under his shirt as he crossed the street. He went home for several minutes and then went to another bar. He was arrested the following day when he returned to the B & A Tap.

OPINION

Defendant first contends that he was not proved guilty beyond a reasonable doubt.

Our supreme court has stated that " 'we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt.' " (*People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631, 634.) Although we will reverse a conviction where the record leaves us with a grave and substantial doubt of defendant's guilt (*People v. Willson* (1948), 401 Ill. 68, 81 N.E.2d 485), it is "the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence." *People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733, 734.

■■ In the instant case the State and defendant presented conflicting accounts of the shooting of James Martinez. Lorenzo Rendon, a witness for the State, testified that he was present and observed defendant shoot Martinez. Defendant, however, denied shooting Martinez. After listening to the testimony in the context of the entire trial and observing the demeanor of the witnesses, the court obviously chose to accept the testimony of Rendon rather than that of defendant. This is clearly the prerogative of the finder of fact. Where the evidence is irreconcilably conflicting it is the function of the trier of fact to ascertain the truth (*People v. Hammond* (1970), 45 Ill. 2d 269, 259 N.E.2d 44), and in such a case we will not substitute our judgment for that of the trier of fact. (*People v. Clark* (1964), 30 Ill. 2d 216, 195 N.E.2d 631.) The testimony of Rendon was certainly not unbelievable, and we see no reason for overturning the determination of guilt.

Defendant next contends that the trial court erred in allowing witnesses Jorge Roman and Juan Perea to assert the fifth amendment privilege against self-incrimination when called to testify.

Jorge Roman and Juan Perea were called as defense witnesses. Roman admitted that he was present in the B & A Tap during the late evening hours of June 1, 1974, and that he was shot in the leg on that date. Roman refused, however, to state who was with him, who shot him, whether he knew Perea and whether he knew who shot Martinez. Perea testified that he was familiar with the B & A Tap, but refused to state whether he was there on June 1 or June 2, 1974. He did, however, deny having a gun on either date and stated that he did not know who shot Martinez on June 2, 1974. Perea further refused to state whether he was present and observed a shooting outside the B & A Tap at approximately 3:30 a. m. on June 2, 1974. Perea and Roman claimed the fifth amendment privilege against self-incrimination to each of the questions which they refused to answer.

Defendant argues that the trial court allowed the witnesses to assert the privilege without first determining that any danger of incrimination actually existed.

■■ It is clear that the protection secured by the fifth amendment must be confined to those instances where the witness has reasonable cause to suspect danger from a direct answer. (*Mason v. United States* (1917), 244 U.S. 362, 61 L. Ed. 1198, 37 S. Ct. 621.) The court must determine whether the answer to a particular question would subject the witness to a real danger of further crimination. (*Rogers v. United States* (1951), 340 U.S. 367, 95 L. Ed. 344, 71 S. Ct. 438.) The witness is not, however, required to demonstrate that a response *would* in fact incriminate him. (See *United States v. Melchor Moreno* (5th Cir. 1976), 536 F.2d 1042.) As the United States Supreme Court stated in *Hoffman v. United States* (1950), 341 U.S. 479, 486-87, 95 L. Ed. 1118, 1124, 71 S. Ct. 814, 818:

> "[I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' "

The Supreme Court of Illinois has established a similar standard for determining whether a fifth-amendment privilege may be exercised. In

*People v. Schultz* (1942), 380 Ill. 539, 544, 44 N.E.2d 601, 603, the court stated that:

> "[I]t must appear from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is a reasonable ground to apprehend danger to the witness from his being compelled to answer."

After reviewing the unanswered questions in the context to the record before us, we believe the trial court correctly allowed Roman and Perea to assert the fifth amendment privilege against self-incrimination. Both Lorenzo Rendon and William Bennett testified that Roman and Perea were present with defendant at the B & A Tap prior to and at the time of the shooting. Rendon and Donald Bridges, the victim's companion, each testified that moments before the shooting defendant asked someone to give him a gun. Apparently someone, presumably Perea or Roman, did give defendant the gun.

Under the facts of this case Roman and Perea could have reasonably feared danger to themselves from the questions which they refused to answer. It would not be overly speculative to suspect that the answers to those questions, or explanations as to why they could not be answered, might directly or indirectly implicate the witnesses in the crime for which defendant was being tried of the homicide of February 27, 1975, which involved the same weapon.

Defendant next contends that the trial court erred in refusing to call Roman and Perea as the court's witnesses. It has been held that no error occurs in a criminal case where the trial court refuses to call an individual as the court's witness until it is shown that the individual is hostile to defendant. (*People v. Bridgeforth* (1972), 51 Ill. 2d 52, 281 N.E.2d 617; *People v. Bolden* (1977), 53 Ill. App. 3d 848, 368 N.E.2d 1319.) In the instant case defendant failed to show any hostility on the part of either Roman or Perea. Therefore, no error occurred. Moreover, in light of our determination that the trial court properly allowed Roman and Perea to assert the fifth-amendment privilege against self-incrimination, defendant suffered no prejudice as a result of the trial court's refusal to call them as the court's witnesses. Accordingly, we find defendant's contention to be without merit.

Defendant finally contends that the sentence of 20 to 30 years imposed by the trial court was excessive. He asks this court to reduce his sentence to a term of 14 years to 14 years and one day.

It is clear that the imposition of sentence is a matter resting within the sound discretion of the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A judgment as to the proper sentence depends upon various factors, including defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. (*People*

*v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, *cert. denied sub nom. Duckett v. Illinois* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.) Moreover, we recognize that the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, §11.

■ Defendant here was convicted of the brutal, violent and apparently unprovoked murder of an innocent young man. The evidence indicates that the slaying was motivated primarily by racial hatred. Considering the heinous nature of this crime, and in spite of defendant's lack of prior convictions, we do not believe the trial court erred in imposing sentence.

Defendant's reliance upon *People v. Mayhone* (1970), 124 Ill. App. 2d 369, 260 N.E.2d 451, is clearly misplaced. In *Mayhone* we reduced defendant's sentence to a minimum term where the evidence established that the deceased and defendant, after drinking together for eight hours, began pushing each other around. During an ensuing struggle, defendant stabbed deceased with a butcher knife. Defendant was 21 years of age at the time of the offense and pled guilty to a charge of murder. Unlike the situation in *Mayhone*, we do not believe the facts of the instant case call for leniency.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.