THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ESTEBAN LOYA, Defendant-Appellant.

First District (1st Division)    No. 79-2144

Opinion filed December 1, 1980.

Arthur J. O'Donnell and Sheila M. Murphy, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Richard Burke, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

This is an appeal from defendant Esteban Loya's conviction, after a jury trial, of the crimes of aggravated battery and armed violence. Defendant received a six-year sentence in the Department of Corrections plus an additional three years' mandatory parole time.

The issues presented for review are: (1) whether the identity of the defendant as the perpetrator was proven beyond a reasonable doubt; (2) whether the trial court erred in excluding a defense witness, who exercised his rights regarding self-incrimination; (3) whether the prosecutor improperly made prejudicial comments to the jury during closing argument; and (4) whether the trial court erred in failing to issue an instruction to the jury concerning the privilege against self-incrimination.

The charges against the defendant herein stemmed from a fight and a shooting which took place on February 17, 1978, in a bar known as the Alma Latina Lounge (hereinafter called the "lounge"), located near the corner of Stewart and 22nd Street, Chicago Heights, Illinois.

At about 10 p.m. on February 17, 1978, Nicholas Reyna sustained a

gunshot wound to the spinal area of his back, while he was at the lounge. He had been drinking beer in the lounge since about 4 p.m. that day. Preliminary investigation revealed the defendant as the prime suspect.

After learning he was wanted for questioning in connection with the shooting, the defendant phoned the Chicago Heights Police Headquarters the following day, February 18, and surrendered himself later that same morning. He was formally arrested and charged as Renya's assailant shortly thereafter. The defendant was with the investigating officer in the case, a detective in the Chicago Heights Police Department. He told the detective about a fight in the lounge but denied the shooting. He said he was being escorted from the lounge when he heard three or four shots fired. He thought the shots were coming from inside the lounge.

At trial, one of the State's principal witnesses against the defendant was Guadalupe Gonzales (Lupe), who knew the defendant by his nickname "Boyd" for three or four years before the shooting. The defendant himself later testified that Lupe was once his dear friend, although not in the sense of boy and girl friend.

Lupe testified that she arrived at the lounge at about 7 p.m. on February 17, 1978. Nicholas Reyne, the defendant, and a man named Tony Sanchez were all present in the lounge when she arrived. She only consumed one alcoholic drink the entire evening. She saw the defendant and Tony Sanchez get into a fight while playing pool together at about 8:30 p.m., as a result of which the defendant was evicted from the lounge by the owner, Juneval Cuellar.

Lupe also testified that she and Tony Sanchez stepped outside the lounge for a few minutes at about 9 p.m. when the defendant drove up in his car with two friends, got out of his car with a gun and fired several shots in the direction of Tony Sanchez. Neither Lupe nor Sanchez was hit, and the bullets landed near Lupe's feet in a pile of snow. The defendant then promptly drove off in his car, and Lupe went back inside the lounge. She then told the owner of the lounge what had happened. He went out the front door, returned and closed the door.

Lupe further testified that she next saw the defendant inside the lounge at about 10 p.m. At that time she saw the defendant enter the lounge and suddenly punch Tony Sanchez in the face, knocking him to the floor. The two men again started fighting. The owner of the lounge promptly evicted the defendant for a second time. Just then, Lupe saw Reyna at the front door pushing the bartender, Juan Cuellar, inside the lounge; Juan is the owner's brother. She then saw the defendant, who was across the street from the lounge, reach into his car, pull out a gun, point it at the lounge and fire it into the lounge. She heard three or four shots and saw Reyna fall to the floor. He had been struck in the right side of the back. After firing the shots the defendant got into his car and drove off.

On cross-examination, Lupe testified that she gave a handwritten account of what occurred, in her own words, at the Chicago Heights Police Headquarters within two hours of the shooting, and that she had discussed the case earlier at the lounge with the Chicago Heights beat officers, who were the first officers to arrive on the scene after the shooting. She recalled telling the beat officers that a third person, Abel Villarreal, accompanied the defendant when he returned to the lounge at 10 p.m. She further testified that she was standing about eight feet from the front door facing it when Reyna was shot and that the defendant was at that time about 15 or 20 feet away from the door, across the street. She also recalled telling the beat officers that she was 15 feet from the door when Reyna returned. Lastly, she admitted writing in her statement that the outside door of the lounge was held open by Abel Villarreal while the defendant took out his gun and fired. However, she denied the accuracy of this statement and insisted that nobody held the door when the defendant shot the gun.

Nicholas Reyna, the complaining witness, testified that he was working at Flint-Coat in Chicago Heights as a fork-lift operator at the time of the shooting. He worked days, from 7 a.m. till 3 p.m. Reyna knew the defendant from the job for a period of 1 to 2½ years before the shooting. The defendant worked the graveyard shift at Flint-Coat, from 11 p.m. till 7 a.m.

Reyna also testified that he went to the lounge after work on February 17, 1978, arriving there about 4 p.m. He began drinking beer and playing pool right away. The defendant came into the lounge about 6 p.m. The defendant and Tony Sanchez were playing pool at about 8:30 p.m., when the two men started fighting and were evicted by the owner. Reyna remained inside the lounge. He further testified that the defendant and Tony Sanchez got into a second fight just inside the front door at about 10 p.m., and both men were evicted by the owner. As the defendant made his way toward his car, which was across the street from the lounge, Reyna went to the front door of the lounge to tell Juan Cuellar to come inside and close the door. Reyna said he saw the defendant outside the lounge at this time. He saw the defendant grab a gun from his car and heard a shot, after which Reyna pushed Juan Cuellar to safety. The second shot hit Reyna in the side of his back, while the third shot fell harmlessly. Reyna testified that he saw the defendant bend over his car and get a gun which the defendant then aimed through the door into the lounge.

On cross-examination, Reyna testified that he drank about 10 beers that night, and that he felt "pretty good" before the shooting. The medical evidence showed that Reyna had an alcohol blood level of .138 just after being shot, and a medical expert testified that a police officer would

consider a person intoxicated if he had an alcohol blood level of .100 or higher.

Reyna further stated that Juan Cuellar was standing outside the front door after evicting the defendant and that he (Reyna) told Juan to get inside. At this time the defendant was positioned directly across the street from the front door of the lounge, where defendant's blue Monte Carlo was parked. Though it was 10 p.m., the street was lighted with a postlight and a light in the door of the lounge. Reyna saw the defendant bend over his car, grab a gun from the inside of the car and aim at the lounge. Reyna started to run inside when he saw some flames and heard a shot. Reyna then pushed Juan Cuellar inside, heard another shot, felt blood on himself, heard another shot, and fell to the floor bleeding from his back.

Reyna also testified that he had retained an attorney to file a dramshop action on his behalf against the lounge, regarding the shooting.

The defendant testified in his own behalf that he was an employee of the Flint-Coat Roofing Company of Chicago Heights. He arrived at the lounge alone at about 9 p.m. on the evening in question. Lupe was then present, as was Tony Sanchez. Sanchez and the defendant played a game of pool together after which the defendant sat down at a table and drank a beer. Suddenly, four men stood up from a table next to the defendant's table, and Tony Sanchez struck the defendant with a beer bottle. A fight began, and Juneval Cuellar separated the defendant and Sanchez, and told the defendant to leave. The defendant left hurriedly without his coat. He testified that upon leaving the lounge he walked three blocks to his home. No one was at his home when he arrived there, and defendant discovered then that his house key and other keys were in his coat which was left at the lounge. As he started to leave his house, two of his brothers, Eleazar and Roberto, drove by, and the defendant flagged them down in order to explain his situation. Roberto then drove the defendant and Eleazar to the lounge, where Roberto got out of the car and Eleazar remained in the car. The defendant saw Tony Sanchez as he walked into the lounge. Sanchez was then in the company of four or five other young male Latinos. The defendant went over to Juneval Cuellar, who was tending bar and asked for his coat, his wallet and his keys. At this time, Sanchez and his friends appeared and the defendant was kicked and struck by them in the head, stomach and legs. Also, the defendant saw Roberto lying on the floor being kicked by one of the young men. The defendant picked him up, and he and Roberto were pushed out the door by Juneval Cuellar.

The defendant told the jury that he did not shoot Reyna, but that his brother Eleazar fired the gun. The defendant testified that as he and Roberto ran across the street from the lounge, towards the car, he saw

Eleazar in the middle of the street with a gun in his hand fire some shots. The defendant later testified that he did not see how Eleazar was holding the gun, or what kind of gun it was, nor did he seen the gun. He also testified that he did not know Eleazar had a gun when he heard the shots being fired, but learned only later when Eleazar told him he had shot at the lounge. He subsequently testified that he was running past Eleazar at a distance of about five feet when he saw that Eleazar had the gun in one hand with his arm extended straight out and the gun parallel to the ground pointed towards the door of the lounge. He saw the flame and heard the gun and said to Eleazar "Come on, let's go." He also testified that his brother Eleazar was four inches taller than himself and was standing erect when he fired the gun. The defendant said that the three brothers ran to the car, and went to the home of their cousin, Calzada, where the defendant spent the night.

The defendant testified on cross-examination that he made several statements to the investigating officer concerning the shooting prior to being booked and jailed and that he failed at such time to mention Eleazar's involvement as Reyna's assailant. He testified further that he told the police that he did not shoot Reyna, and that Roberto accompanied him back to the lounge just before the shooting. The defendant also told police that he heard three or four shots as he was being evicted from the lounge and he thought they came from inside the lounge. Lastly, the defendant testified that Reyna and Lupe were correct in saying that the shots came from across the street and went into the lounge door.

The defendant's final witness and the last person to testify at the trial was Eleazar Loya. Eleazar testified that he was the defendant's brother and that he lived at 22540 Yates Street in Sauk Village. When asked by defense counsel whether he was present at the lounge in question on February 17, 1978, the witness produced an envelope on the back of which appeared the following handwritten note: "On advice of counsel, I decline to answer on the grounds that any answer I give might tend to incriminate me. I decline to answer any further questions." The envelope in question was promptly admitted as the court's exhibit No. one in evidence. The author of the handwriting on the envelope was never established.

When Eleazar appeared to have difficulty in reading the handwritten notation, the jury was excused. The court then inquired whether defense counsel had previously talked to the witness. Defense counsel denied ever having done so, adding that he got Eleazar Loya to appear for the defendant through defendant's father. Also, Eleazar Loya's name and his attorney's name appear on defendant's list of witnesses.

After the jury returned, the witness stated he was only able to

understand a little bit of English and that he could not understand one of the words on the envelope at all. The court and defense counsel inquired whether he wanted the court's help in reading the note. Receiving an affirmative reply, the court then read the note out loud, in the jury's presence.

The following discussion then took place in the jury's presence:

"Mr. [defense counsel] Schwartz: Mr. Loya, you say on advise of Counsel, is that right? That means a lawyer, a lawyer wrote that for you or told you to say that?

The Witness: Yes, my lawyer.

The Court: It wasn't me, was it?

The Witness: It wasn't.

Mr. Schwartz: What is your lawyer's name?

The Court: I am afraid to permit any further questioning for fear that by answering any further questions someone might contend he waived his rights under the Fifth Amendment.

Mr. Schwartz: Well, I can't even ask him any more questions.

The Court: That is the statement that is written, the last sentence of the handwriting, so to permit any further questions, I might be evading his right, so I will excuse the witness.

Mr. Schwartz: I guess we have no choice.

The Clerk: You are excused, Mr. Loya."

The defendant thereupon rested. The State also rested, having no rebuttal evidence. Following an instruction conference both sides presented closing argument. The jury was instructed, and the case was submitted for decision. The defendant was found guilty of armed violence and aggravated battery.

· The defendant claims his identity as the perpetrator was not proven beyond a reasonable doubt. More specifically, it is argued that the State's eyewitnesses mistakenly identified the defendant as the perpetrator, instead of the defendant's brother, Eleazar.

The law is well settled in Illinois as to a certain aspect of deference owed to a trial judge and jury by courts of review. The credibility of witnesses, the weight to be given their testimony and the inferences to be drawn therefrom are for the trier of fact and, upon review, courts of review will not substitute their judgment for the fact finder's judgment unless it clearly appears there is a reasonable doubt of the defendant's guilt. A conviction will not be set aside merely because the evidence is contradictory. See *People v. Guido* (1962), 25 Ill. 2d 204, 184 N.E.2d 858; *People v. Pride* (1959), 16 Ill. 2d 82, 156 N.E.2d 551.

Where the identity of the accused is at issue, the testimony of even only one witness is sufficient to convict, provided that the accused is observed under circumstances which would allow a positive identifi-

cation to be made (*People v. Marion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313). As stated in *People v. Reed* (1980), 80 Ill. App. 3d 771, 400 N.E.2d 688:

> "The key factor is to determine if the witness had an opportunity under adequate conditions to view the offender at the time of the commission of the crime. [Citation.] It is not required that the validity of the identification be based upon perfect conditions for observation or that the time for observation be of a prolonged nature." *Reed*, 80 Ill. App. 3d 771, 777, 400 N.E.2d 688, 693.

The defendant claims there are inconsistencies in Lupe's testimony with regards to whether she was eight feet or 15 feet from the door of the lounge when the shots were fired and whether the perpetrator was standing near the doorway or across the street when the assailant fired the shots into the doorway.

As to the alleged discrepancy with regard to where Lupe was standing, it appears from the record that the discrepancy arose when a police report included a diagram which placed Lupe farther from the doorway of the lounge than the eight feet which she testified to. However, the police officer who drew the diagram testified that the diagram was an approximation and was not drawn to scale. The alleged discrepancy of the position of the perpetrator at the time the shots were fired arose because Lupe's written statement to the police indicated that Abel Villareal had held the door while the defendant fired into the tavern, yet at trial Lupe testified that the statement was not accurate, that the defendant was standing across the street from the lounge when he fired the shots and that Abel was not holding the door at the time. It further appears from the record, by defendant's own testimony, that Lupe's trial testimony was correct in the sense that the shots were fired from across the street into the lounge.

■■ These alleged discrepancies, to the extent there are any, are minor. Such discrepancies are not unusual and go only to the weight to be given the testimony by the trier of fact; they do not destroy the credibility of the witnesses. The minor variations do not compel us to find that the evidence was so unsatisfactory as to raise a reasonable doubt of defendant's guilt. See *People v. Bell* (1972), 53 Ill. 2d 122, 290 N.E.2d 214.

■■ The defendant also argues that the victim's credibility is questionable because the victim testified that he had instituted a dramshop action against the lounge. The law in Illinois is clear, however, that interest in a dramshop suit affects only the weight of the witness' testimony (*People v. Simmons* (1950), 407 Ill. 417, 95 N.E.2d 477). The credibility of the victim was for the jury to decide. It was aware of the victim's interest in the dramshop action and still found his testimony credible.

■■ The defendant also points out that there were 30 to 40 people in the

lounge at the time of the shooting, yet the State produced only two eyewitnesses. Defendant then argues that such a fact somehow diminishes the credibility of the two eyewitnesses who were produced. However, the law in Illinois clearly provides that the State need not introduce evidence corroborative of an identification by calling all the occurrence winesses to testify. (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898.) In the case at bar, the State produced two credible eyewitnesses, both of whom knew the defendant personally for a number of years. Their testimony was positive and sufficient to convict the defendant. See *Marion*; *Reed*.

Presumably, the jury adjudged the defendant's guilt based not only upon the testimony of the State's witnesses, but also upon the improbability of the defendant's own story. The trier of fact is entitled to disbelieve the defendant's version of the circumstances, especially in view of testimony that the defendant had told a different story to the police. See *People v. Morehead* (1970), 45 Ill. 2d 326, 330, 259 N.E.2d 8, 10.

The issue is one of identification. The defendant agrees with how well Reyna and Lupe knew him and how often they observed him that night before the shooting. He testified that his brother, Eleazar, was about four inches taller than he. The jury also saw the defendant's brother, Eleazar, and thus judged for themselves whether the defendant could have been mistaken for him. The unreasonableness of the defendant's story is also demonstrated by the contradictions in his testimony concerning his own viewing of Eleazar's shooting the gun.

The defendant admitted that he failed to relate his trial version of the events to the police when he turned himself in, even though he knew he would be charged with the shooting. He told the police only that he thought the shots he heard had come from inside the lounge. He did not even mention Eleazar.

For the above reasons, it is clear that the identification of the defendant as the perpetrator was proven beyond a reasonable doubt.

In addition to claiming he wasn't proven to be the perpetrator, the defendant claims the trial court erred in dismissing Eleazar Loya as a witness. Furthermore, the defendant claims the prosecutor made improper comments during closing argument, and the trial judge should have issued an instruction to the jury concerning the privilege against self-incrimination.

In addition to claiming no errors occurred at trial, the State claims that these allegations of errors have been waived by the defendant's failure to include them in his written motion for a new trial.

Notwithstanding the above, the defendant claims the trial court committed plain error by dismissing witness, Eleazar Loya, pursuant to his claim of Fifth Amendment privilege, by allowing improper comment

on the exercise of that right and by failing to instruct the jury on the Fifth Amendment privilege.

Supreme Court Rule 615 (Ill. Rev. Stat. 1977, ch. 110A, par. 615) provides that plain errors affecting substantial rights may be noticed although they were not brought to the attention of the trial court. The exercise of this option is discretionary by the reviewing court (*People v. Fleming* (1965), 54 Ill. App. 2d 457, 203 N.E.2d 716), depending on the closeness of the case, the conduct of the trial judge, the extent to which the error may have contributed to the verdict, and the magnitude of the error alleged. *People v. Lagardo* (1967), 82 Ill. App. 2d 119, 226 N.E.2d 492; *People v. Jones* (1971), 131 Ill. App. 2d 361, 268 N.E.2d 248.

■■ Considering that the defendant claims his Sixth Amendment rights to obtaining witnesses in his favor (U.S. Const., amend. VI) has been violated, we are justified in considering the alleged errors as plain error under Supreme Court Rule 615.

The defendant contends that his brother's claim of Fifth Amendment privilege was mishandled by the trial court. Defendant argues he was entitled to a hearing on the question of whether or not Eleazar Loya was entitled to invoke the Fifth Amendment, as to each question offered.

■■ It is clear that a witness called by a defendant in a criminal case has the constitutional right to refuse to answer questions which tend to incriminate him. (*People v. Pantoja* (1976), 35 Ill. App. 3d 375, 381, 342 N.E.2d 110, 115; *People v. McLaren* (1979), 77 Ill. App. 3d 368, 373-74, 395 N.E.2d 1219, 1223.) The determination of whether to hold a hearing on the question of the expanse of the witness' privilege not to testify is one of judicial discretion. In the case at bar, the defendant failed to request a hearing be held. In addition, defense counsel failed to object to the dismissal of the witness and failed to present an offer of proof as to the questions he would have asked and the relevant information he would have elicited. Under the circumstances of this case, the trial judge properly exercised his discretion in excusing the witness with conducting a hearing.

The defendant further claims the trial court erred in allowing improper comment on the witness' exercise of his right not to incriminate himself.

During closing argument in the instant case, defense counsel remarked that the defense had called Eleazar Loya to testify but that he had invoked his constitutional privilege. In the State's rebuttal closing argument, the prosecutor said:

"Jurors who have sat on cases might have had some idea of what was going to happen. Those who haven't, of course, this is a new thing, but what went on here, what the cruelest hoax ever pulled on justice I have ever seen, you know how easy it is for a Defendant to

take the stand, to deny everything, and say it didn't happen, say somebody else did it and then with the built in defense of this Fifth Amendment call someone to the stand that the Defendant says did it.

Let that person with the note in his hand, which, obviously, he didn't write—

[Defense counsel]: I will have to object if this is a suggestion of subordinaiton [sic] of perjury.

[Assistant State's Attorney]: Nothing like that.

The court: No, this is a fair comment on what occurred is all I can conclude.

[Defense counsel]: Would the Court note my objection?

The court: Overruled.

[Defense counsel]: Thank you.

[Assistant State's Attorney]: How easy it is to have this note, which the man obviously didn't write himself, take that note and say I can't answer any questions because I got a right to the Fifth Amendment. So the perfect joke on everyone has been made * * * ."

The law in Illinois is clear with regard to the propriety of a prosecutor's closing argument. Closing argument is proper where it is based upon relevant evidence in the record or legitimate inferences deducible therefrom (*People v. Wright* (1974), 56 Ill. 2d 523, 531-32, 309 N.E.2d 537, 541). In addition, a prosecutor may reflect unfavorably upon the accused so long as his remarks are based upon the evidence in the record and reasonable inferences deducible therefrom. *People v. Wirth* (1979), 77 Ill. App. 3d 253, 260, 395 N.E.2d 1106, 1111.

■■ The prosecutor commented on the inference claimed by the defendant and which stemmed from the witness' Fifth Amendment claim, that the witness had committed the shooting and not the defendant. The prosecutor also commented that such an inference was a "hoax" pulled on justice. It appears from the record that the trial court believed these comments of the prosecutor were fair comments on what occurred, and we agree. The trial court properly allowed the prosecutor to respond to defendant's closing argument and to reflect upon the unfavorable inferences toward defendant which are deducible from the record.

The defendant additionally argues that the trial court erred in failing to issue an instruction to the jury on the privilege of self-incrimination.

As previously stated, the defendant did not object to the trial court's handling of Eleazar Loya's testimony. In addition, the defendant offered no instruction pertaining to a witness' invocation of the Fifth Amendment.

■■ The law in Illinois as to the question of giving jury instructions *sua sponte* is that a party who desires a specific instruction must offer it and

request the court to give it, and the trial court has no obligation to instruction on its own motion (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487, 489). The only exception to this rule in criminal cases is that the court must instruct the jury as to the elements of the crime charged, the presumption of innocence and the burden of proof (*Parks*). Under the circumstances of the case at bar, we conclude the trial court was not required to give an instruction pertaining to the witness' claim of the Fifth Amendment privilege, and its failure to do so was not error.

For the above and foregoing reasons the judgment of the circuit court of Cook County is hereby affirmed.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.