THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANGELO P. KATSIGIANNIS, Defendant-Appellant.

Second District No. 2—87—0518

Opinion filed June 30, 1988.

Law Offices of John F. Donahue, of Oak Brook, and Glenn M. Sowa, of Law Offices of John F. Donahue, of Geneva, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Mary E. Gentile, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant appeals from convictions of keeping a gambling place (Ill. Rev. Stat. 1985, ch. 38, par. 28—3) and three counts of gambling (Ill. Rev. Stat. 1985, ch. 38, pars. 28—1(a)(5), (a)(6)). Defendant was sentenced to concurrent terms of one-year probation on each of the convictions, fined $1,000 on his conviction of keeping a gambling place, and $500 on each of his convictions of gambling. On appeal, defendant challenges the sufficiency of the evidence and further contends that the trial court erred by (1) allowing hearsay evidence under the coconspirator's exception of the hearsay rule; (2) failing to hold a hearing to determine whether a defense-subpoenaed witness was entitled to protection under the fifth amendment; and (3) giving defendant an excessive sentence. We affirm.

Defendant, Angelo Katsigiannis, was arrested following a six-month undercover surveillance at the Villa Tap, a Villa Park, Illinois, bar he owned and operated. Officers from the Illinois State Police received information that organized gambling was taking place at the Villa Tap and that a party by the name of "Angelo" was involved. The case against defendant was established primarily through the testimony of Illinois State Police officer Robert Kahn, who acted as a patron of defendant's establishment during the course of the surveillance. Kahn's testimony is summarized as follows.

On June 6, 1985, Kahn was present at the Villa Tap and overheard a conversation between defendant and another patron, Alan Fey, in which they spoke of sports teams, player statistics, and Fey's intention to place wagers on several baseball contests. Fey left mo-

mentarily, and Kahn observed defendant subsequently answer a telephone behind the bar. Defendant made notations on a pad of paper while talking on the telephone and was overheard mentioning baseball teams and using the expression "minus nine." After defendant hung up the phone, Kahn observed Fey return from an area of the bar in which a public telephone was located. Defendant and Fey then discussed wagers they both intended to make on several baseball teams. Kahn heard Fey say "I have to get these in," and observed defendant take $.25 out of the cash register and give it to Fey. Fey then made a telephone call on the public telephone and subsequently returned to tell defendant "[t]hey're in." Before leaving the Villa Tap on that date, Kahn obtained two sheets of paper from the top of the pad used by defendant to make notes during his phone call. Kahn turned the two sheets of paper over to the State Police laboratory to raise any impressions existing on those sheets. Testing revealed the name "Rick" along with numerous numbers and symbols including "-9." Kahn testified that based upon his past experience he was familiar with the definition of the term "-9" in gambling parlance. Kahn described the "plus" and "minus" system as being grounded on a formula for bookmakers' odds and a base figure of $100. Kahn testified that although he did not understand the formula itself, "-9" represented a wager of $109 to win $100.

On June 11, 1985, Kahn was present at the Villa Tap and had a conversation with Fey. Fey read Kahn baseball and horse racing betting information from several newspapers and asked Kahn if he "wanted anything to go in." Kahn responded that he did, handed Fey a slip of paper with the names of two horses, and told him that he wanted to wager $50 on them. Fey then made a telephone call and subsequently returned to tell Kahn that they "were in." When asked how he should pay his bet, Fey told Kahn that if Fey was not at the Villa Tap on the following day Kahn should "leave the money at the bar with Angelo." Defendant was not present at that time.

On June 12, 1985, defendant, Fey, and Kahn were all present at the Villa Tap when Fey advised Kahn that the horses had lost. Kahn then counted out $50 in the presence of defendant and handed it to Fey. Fey subsequently announced that he was going to call in additional wagers and asked Kahn if he wanted to place a wager. Kahn responded that he did and gave Fey the name of a horse. Kahn subsequently observed Fey make a phone call. The record is not clear whether defendant was present when Fey and Kahn discussed this wager.

On June 13, 1985, Kahn again met Fey at the Villa Tap and paid

him $25. Kahn subsequently observed a conversation between defendant and Fey. Fey asked defendant whether he had something for him, to which defendant responded that he did and handed Fey a $10 bill wrapped in a piece of paper. As defendant handed Fey the money and the paper Kahn heard him say "Montreal 10, Cubs 10." Fey took the money and placed the paper on the bar. Kahn later obtained the paper, which contained the notation "Larry C. Cubs $10 L. Painter Montreal $10." Later on that same date, defendant asked Kahn if he wanted to participate in a football pool. Kahn placed his initials in two of the squares on a football pool card and paid defendant $2 after defendant asked him for the money.

On June 21, 1985, Kahn was present at the Villa Tap and overheard a conversation between defendant and Fey during which defendant told Fey that he wanted to make a wager on the Chicago Cubs baseball team. Defendant took a piece of paper and wrote out "Cubs, Angelo, one-half, -15," and gave it to Fey, who subsequently took the paper and walked toward the area of the public telephone. Kahn testified that "-15" would normally represent a wager of $115 to win $100. Kahn further testified that "one-half" in bookmakers' parlance means $50.

On June 28, 1985, Kahn was again at the Villa Tap. Defendant told Kahn that he had seen him speaking to another patron, Edward DeLaire, also a suspect in the gambling investigation, and asked Kahn if he was "doing business" with DeLaire. Kahn responded that he was "doing some horses." Kahn met DeLaire at the Villa Tap on July 5, 1985, and at that time settled several wagers he made during the previous week. Also on that date, Kahn spoke to defendant, who told Kahn that he had lost all of his wagers from the previous week. Defendant also showed Kahn a stack of papers which he identified as a pool he was conducting on the premises. On August 9, 1985, Kahn again met DeLaire at the Villa Tap at which time DeLaire paid Kahn $228. Defendant was present on that date; however, the record is not clear whether the payment was made in defendant's presence.

On August 23, 1985, Kahn again went to the Villa Tap. Defendant was present on that date and handed Kahn a football pool card. Kahn placed his initials in several of the squares and returned the card to defendant with payment of $2. At Kahn's request, defendant also provided him with a blank pool card. Also on that date, DeLaire entered the bar and paid Kahn $123.

Defendant was arrested on November 17, 1985. At the time of his arrest, defendant was in possession of $255 and two slips of paper bearing the names of teams in a number of college and professional

football contests. Various "plus" and "minus" figures were written next to some of the team names. These items were seized along with several football pool cards. No testimony was given regarding the significance of the figures appearing on the two slips of paper. Defendant stated that the money was his own and he intended to use it to open up the bar. Defendant was charged by information with one count of keeping a gambling place and six counts of gambling.

At defendant's subsequent trial, Kahn acknowledged on cross-examination that he had consumed several drinks during each visit to the bar. Kahn also acknowledged that in the course of his surveillance of DeLaire, he requested that DeLaire meet him at the Villa Tap to conduct transactions. Kahn further stated that he never saw Fey use a private phone at the Villa Tap when placing gambling transactions.

Defendant testified on his own behalf and stated that he was the owner and operator of the Villa Tap. Defendant stated that although he conducted occasional football pools in the bar, he was not aware of any organized gambling occurring on that premises. Defendant and other witnesses also testified that there was not a telephone located behind the bar at the location Kahn described.

Defendant further subpoenaed and called Alan Fey to the witness stand. Fey invoked his fifth amendment protection against self-incrimination and refused to answer any questions. Defense counsel asked the court to ask Fey whether charges against him were pending or disposed of, noting that if charges were not pending against him, Fey could not invoke the fifth amendment. The court noted that Fey's name was mentioned in relation to criminal activity occurring on several dates during the six-month surveillance, and stated that unless the State was going to grant him immunity, Fey properly asserted his privilege. The State announced that it would not grant Fey immunity, and the court excused him as a witness.

The jury returned guilty verdicts against defendant for keeping a gambling place and three counts of gambling, including conducting football pools on June 13, 1985, and August 23, 1985, and possessing gambling instruments on the date of his arrest, November 17, 1985. Defendant was sentenced to concurrent terms of one-year probation on each charge, fined $1,000 on his conviction for keeping a gambling place, and $500 on each of his convictions for gambling. Defendant then brought this appeal.

Defendant first contends that the guilty verdict against him on count I for keeping a gambling place is "against the manifest weight of the evidence." That count charged defendant with knowingly permitting his premises to be used as a gambling place between June 6,

1985, and November 17, 1985, "inclusive." Focusing on the State's use of the term "inclusive," defendant first argues that the evidence was insufficient under this count since he was acquitted of gambling activity on June 6, 1985. Defendant contends that pursuant to the language of the information, the State was required to prove him guilty of gambling on that date. We disagree.

■ Section 28—3 of the Criminal Code of 1961 prohibits any person from "knowingly permit[ing] any premises or property owned or occupied by him or under his control to be used as a gambling place." (Ill. Rev. Stat. 1985, ch. 38, par. 28—3.) In order to support a conviction for keeping a gambling place, the State must prove that (1) the defendant owned, occupied, or controlled the premises; (2) the building was used for the purposes of gambling; and (3) the defendant knowingly permitted that use. *People v. Perry* (1966), 34 Ill. 2d 229, 232; *People v. Sterling* (1973), 12 Ill. App. 3d 118, 121.

In the instant action, there is no question that defendant was the owner of the Villa Tap and acted as the bartender of that establishment. In addition, defendant admitted that he conducted football pools on that premises on an occasional basis, and the jury found him guilty of two counts of gambling for conducting football pools on two specific dates. Thus, by defendant's own testimony and the proofs established at trial, the State proved that the Villa Tap was used for the purposes of gambling. Kahn's testimony that he witnessed defendant place several wagers with Fey and defendant's own testimony establishes that defendant knowingly permitted the Villa Tap to be used for gambling. Thus, there seems to be no question that the State satisfied its burden of proving defendant guilty of keeping a gambling place. See *Perry*, 34 Ill. 2d at 232; *Sterling*, 12 Ill. App. 3d at 121.

■ Defendant's argument that his acquittal of gambling activity on one of the dates listed in that information is fatal to his conviction for keeping a gambling place is not well taken. Defendant does not present this court with a compelling argument or legal authority for his conclusion that the State's use of the term "inclusive" in the information requires his conviction for gambling on the dates listed in that information. Indeed, defendant need not be the actual gambler or an otherwise active participant in the gambling activity in order to be found guilty of the offense of keeping a gambling place. (See *Perry*, 34 Ill. 2d at 232; *Sterling*, 12 Ill. App. 3d at 121.) The dates included in the information described the dates of the undercover surveillance of the Villa Tap, and the State presented evidence of gambling activity occurring at the Villa Tap during the course of that surveillance. Thus, we find the State's proof sufficient to sustain defendant's con-

viction under count I for keeping a gambling place.

Defendant also argues that the jury's verdict on count I is "against the manifest weight of the evidence" given defendant's proof of entrapment. We disagree.

■■ Entrapment is established where law enforcement officers conceive of a criminal enterprise and induce the defendant to commit an offense which he would not have otherwise committed absent the inducement. (*People v. Dabrowski* (1987), 162 Ill. App. 3d 684, 696; *People v. Norks* (1985), 137 Ill. App. 3d 1078, 1083.) However, entrapment does not exist where the defendant has the intent to commit the crime and does so merely because the officer either affords him the opportunity or purposely aids and encourages him in its preparation. (*Dabrowski*, 162 Ill. App. 3d at 696; *Norks*, 137 Ill. App. 3d at 1083.) Thus, for an entrapment defense to succeed, the evidence must disclose an improper inducement on the part of the officer coupled with a lack of predisposition to commit the crime on the part of the defendant. (*Dabrowski*, 162 Ill. App. 3d at 696; *Norks*, 137 Ill. App. 3d at 1083.) The issue of whether a defendant has been entrapped is a question for the trier of fact, and the determination of predisposition rests upon the facts of the case. (*Norks*, 137 Ill. App. 3d at 1082-83.) Once the defense is raised, the State must prove beyond a reasonable doubt that entrapment did not occur. 137 Ill. App. 3d at 1083.

■ In the instant action, the evidence produced at trial established that the police officers set up the surveillance at the Villa Tap only after being advised that gambling was occurring at that location and that several persons including a person by the name of "Angelo" were involved. While there is some support in the record that Kahn did encourage DeLaire to meet him at the Villa Tap to conduct transactions, there is significant evidence in the record independent of Kahn's transactions with DeLaire to establish that defendant was not entrapped. Evidence was presented that defendant solicited Kahn's participation in two football pools. Moreover, Kahn testified that he overheard and witnessed defendant place several wagers with Fey. No evidence was presented establishing that Kahn induced defendant to conduct the football pools or to place any wagers with Fey. Thus, based on the evidence presented in the record, the jury could reasonably have determined that defendant was not entrapped.

Defendant next contends that the guilty verdict against him on count V for knowingly possessing gambling instruments, namely, a racing form, football pool cards, and betting slips, is "against the manifest weight of the evidence." Defendant argues that no evidence of a racing form was admitted at trial and further states that no ex-

pert testimony was presented to establish that the instruments admitted were in fact gambling documents. We disagree.

Count V charges defendant with gambling pursuant to section 28—1(a)(5) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 28—1(a)(5)). Section 28—1(a)(5) provides that a person commits gambling when he "[k]nowingly owns or possesses any book, instrument or apparatus by means of which bets or wagers have been, or are, recorded or registered." (Ill. Rev. Stat. 1985, ch. 38, par. 28—1(a)(5).) Noting that the only evidence presented at trial establishing that these items were in fact gambling instruments was the testimony of Officer Kahn, defendant cites *People v. Uritz* (1971), 133 Ill. App. 2d 670, 672, for the proposition that a police officer's assumption that certain notations written on several slips of paper represent amounts of wagers is insufficient to support a conviction for possession of gambling instruments. In *Uritz*, the officer characterized an alleged betting slip as being " 'strange,' " and the court noted that the officer's assumptions regarding the nature of the notations on that instrument were "never adequately explained." 133 Ill. App. 2d at 672.

In the instant action, the State presented evidence that on the date of his arrest defendant was in possession of football pool cards and two sheets of paper with the names of football teams in a number of football contests with "plus" and "minus" figures written next to them. The officer who seized the evidence testified that the pool cards were used to record the purchase of a particular square on the card. However, no testimony was given regarding the significance of the symbols and numbers on the two sheets of paper recording the football contests. Nonetheless, we note that Kahn previously testified regarding his understanding of the definition of "plus" and "minus" figures in gambling parlance. Kahn explained to the court that the "plus" and "minus" symbols were grounded on a formula for bookmaker's odds and a base figure of $100. Although Kahn admitted that he did not completely understand the formula, he gave the court examples of how the "plus" and "minus" figures are used in computing a wager. Responding to a question from defense counsel, Kahn stated that he was not merely assuming these facts to be true, but rather was testifying based on his experience. An officer may testify that items are gambling instruments based upon his experience. (See *People v. Sawyer* (1969), 42 Ill. 2d 294, 298; *People v. Davis* (1966), 34 Ill. 2d 38, 40; see also *People v. Semmler* (1931), 345 Ill. 272, 276-77 (testimony that paper contained number of horse and person's initials "fairly tend[ed] to show that the notations *** were the recording of a bet").) Thus, we find Officer Kahn's testimony and explanation re-

garding the "plus" and "minus" figures based on his experience to be sufficient evidence that the two pieces of paper seized from defendant at the time of his arrest were gambling instruments. In addition, we note that the officer who seized the evidence testified regarding the use of the football pool cards, and our own independent examination of that evidence reveals their obvious nature for use in betting on football games. We further note that defendant himself testified that he conducted occasional football pools on the premises, and Kahn told the court that he purchased several squares in defendant's football pools. While we agree with defendant that no evidence of racing forms was admitted at trial, we do not find the State's failure to introduce that evidence fatal to defendant's conviction on count V for possession of gambling instruments.

Defendant next contends that the trial court erred in admitting the hearsay statements of Fey and DeLaire under the coconspirator's exception to the hearsay rule. Defendant argues that there is no independent evidence apart from the hearsay statements which establishes defendant's participation in a conspiracy with the declarants. We disagree.

■ The coconspirator's exception to the hearsay rule provides that acts and declarations of a coconspirator made in furtherance of the conspiracy are admissible against a defendant even when they are made outside the defendant's presence. (*People v. Abrego* (1986), 142 Ill. App. 3d 973, 983; *People v. Edwards* (1984), 128 Ill. App. 3d 993, 1003; see also *People v. Olmos* (1979), 77 Ill. App. 3d 287, 291.) To avail itself of the coconspirator's exception, the State need not charge the crime of conspiracy nor indict and try all of the coconspirators, but rather need only establish a *prima facie* case through independent evidence that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach another end by criminal means. (*Abrego*, 142 Ill. App. 3d at 983; *Edwards*, 128 Ill. App. 3d at 1003-04; *Olmos*, 77 Ill. App. 3d at 291.) The existence of an agreement which is the essence of a conspiracy need not be proved by direct evidence, but may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the defendant. *Abrego*, 142 Ill. App. 3d at 983; *Edwards*, 128 Ill. App. 3d at 1004; *Olmos*, 77 Ill. App. 3d at 291.

■ We believe the record in the instant action provides an adequate basis to determine that a conspiracy existed between defendant and Fey independent of the hearsay statements of Fey. The State introduced evidence that Kahn overheard a conversation between defendant and Fey in which *defendant* stated that he "wanted to

make a wager on the Cubs." Kahn observed defendant write "Cubs, Angelo, one-half, -15" on a piece of paper and hand it to Fey who subsequently left to make a phone call. In addition, Kahn testified that he observed defendant hand Fey a $10 bill wrapped in a piece of paper and heard *defendant* say to Fey "Montreal 10, Cubs 10." Kahn testified that he later obtained the paper and it contained the notation "Larry C. Cubs $10 L. Painter Montreal $10." Finally, Kahn testified that defendant acknowledged seeing him talking to DeLaire and asked him if he was doing business with DeLaire. Kahn testified that he responded that he was "doing some horses." We believe these acts and declarations of defendant are sufficient *prima facie* evidence of a conspiracy to justify the trial court's permitting the hearsay declarations of Fey and DeLaire under the coconspirator's exception of the hearsay rule.

In so ruling, we reject defendant's further contention that in order to invoke the coconspirator's exception of the hearsay rule, the declarant must first be determined to be unavailable. Illinois has previously followed the rule that evidence admitted under the coconspirator's exception to the hearsay rule does not violate the confrontation clause of the sixth amendment because defendants are able to confront and cross-examine the witnesses who allege that the statements at issue were made. (*People v. Goodman* (1980), 81 Ill. 2d 278, 284; *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 1037.) The United States Supreme Court has recently held that the confrontation clause does not require a showing that a nontestifying coconspirator is unavailable to testify as a condition for admission of that coconspirator's out-of-court statements. (*United States v. Inadi* (1986), 475 U.S. 387, 399-400, 89 L. Ed. 2d 390, 401, 106 S. Ct. 1121, 1129.) This rule has been adopted in Illinois, and we see no reason to depart from it in the case before us. (See *People v. Unes* (1986), 143 Ill. App. 3d 716, 723.) In any event, the record establishes a basis for the determination that at least one of the declarants, Fey, was in fact unavailable. Fey was implicated in criminal activity on numerous dates relevant to the undercover surveillance and, when called to testify on defendant's behalf, invoked his fifth amendment privilege against self-incrimination. Thus, we conclude that the trial court did not err in admitting the hearsay statements under the coconspirator's exception of the hearsay rule.

Defendant next contends that the trial court erred in failing to determine if Fey properly invoked his fifth amendment protection to refuse to testify after having been subpoenaed by defendant. We disagree.

A witness called by the defendant in a criminal case has the constitutional right to refuse to answer questions which tend to incriminate him. (*People v. Loya* (1980), 90 Ill. App. 3d 1078, 1087.) The fifth amendment protection must be confined to those instances where the witness has reasonable cause to suspect danger from a direct answer. (*People v. McLaren* (1979), 77 Ill. App. 3d 368, 373.) While it is necessary for the court to determine whether the answer to a particular question would subject the witness to a real danger of further incrimination (77 Ill. App. 3d at 373), the determination on whether to hold a hearing on the expanse of the witness' privilege not to testify is one of judicial discretion. (*Loya*, 90 Ill. App. 3d at 1087.) In *Loya*, the court held that the trial court did not abuse its discretion in excusing a defense witness on fifth amendment grounds without conducting a hearing. (90 Ill. App. 3d at 1087.) The court noted that counsel did not request that a hearing be held, did not object to the dismissal of the witness, and did not make an offer of proof as to the questions he would have asked and the relevant information he would have elicited. 90 Ill. App. 3d at 1087.

In the instant action, defense counsel did ask the court to inquire of Fey whether he had any charges pending, and the court complied with that request. It was determined that one count of syndicated gambling had been brought against Fey for his conduct on a particular date and that charge had reached a disposition. However, the court disagreed with defense counsel's assertion that the disposal of this charge negated Fey's fifth amendment privilege, noting that the undercover investigation lasted six months and Fey's name was mentioned with respect to possible criminal activity on a number of dates within that period. After the State indicated that it had no intention of granting immunity to Fey for criminal activity on the remaining dates, the court excused Fey as a witness. Defense counsel subsequently represented that, had Fey testified, defense counsel would have asked him if he had ever bet or received bets from defendant or if he ever told Kahn to give the proceeds of a gambling wager to defendant for him. Defense counsel did not represent to the court what Fey's answers to those questions would have been. Defense counsel's request that the trial court inquire of Fey regarding pending charges and counsel's subsequent "offer of proof" is at best a weak attempt to make the record lacking in *Loya*. Nonetheless, even were we to find it sufficient, it would not follow that the trial court abused its discretion in excusing Fey without a hearing. Our supreme court has stated:

"[I]t must appear from the circumstances of the case and the

nature of the evidence which the witness is called to give, that there is a reasonable ground to apprehend danger to the witness from his being compelled to answer." (*People v. Schultz* (1942), 380 Ill. 539, 544.)

(See also *McLaren*, 77 Ill. App. 3d at 374.) Here, the court determined that because Fey's name had been mentioned with respect to other criminal acts for which he had not yet been charged, and since no immunity was offered by the State, his testimony imported great danger of self-incrimination. After reviewing the portions of the transcript wherein Fey's name is mentioned and the questions intended for Fey by defense counsel, we believe that the trial court correctly allowed Fey to assert his fifth amendment privilege and properly excused him as a witness.

 Defendant next contends that the sentence imposed upon him was improper and an abuse of discretion as it was excessive in comparison to the sentence of supervision received by Fey. We disagree.

It is well settled that it is not the function of a reviewing court to serve as a sentencing court and, absent an abuse of discretion, the sentence of the trial court will not be disturbed on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154; *People v. Wolfe* (1987), 156 Ill. App. 3d 1023, 1028.) The trial court sits in a superior position to consider and determine the punishment to be imposed, and the trial court's decision is entitled to great deference. (*Perruquet*, 68 Ill. 2d at 154.) While fundamental fairness and a respect for the law require that defendants similarly situated should not receive grossly disparate sentences, a disparity in sentencing may be supported where defendant's participation in the offense is greater than the individual with whom the defendant's conduct is being compared. *Wolfe*, 156 Ill. App. 3d at 1028.

In the instant action, defendant was sentenced to one-year probation and fined $1,000 on one count of keeping a gambling place. Defendant was further given one-year probation and fined $500 on each of three counts of gambling. Defendant's terms of probation were made concurrent. Defendant's argument that his sentence is improper given the disparity between it and Fey's sentence is not well taken. Defendant has not presented this court with a proper record upon which to compare defendant's sentence to Fey's. While both defense counsel and the State represented that Fey received supervision after the charge against him was disposed of, we are not provided with the circumstances behind the disposition of that charge or the factors that went into his sentencing. Moreover, there is some indica-

tion in the record that Fey pleaded guilty to a lesser charge. A sentence imposed as a result of a negotiated guilty plea is an improper basis of comparison with a sentence imposed after a trial. *Abrego*, 142 Ill. App. 3d at 985.

Even if we were to compare these sentences, it is clear that the disparity between them is not improper. Defendant's sentence was the result of convictions after trial on four separate offenses including keeping a gambling place and three counts of gambling. In contrast, Fey, although originally charged with one count of syndicated gambling, was found guilty of the offense of one count of gambling. The court took defendant's multiple convictions into account at the sentencing hearing and found the guilty verdict against defendant for keeping a gambling place particularly significant. Defendant was subject to a sentence of *imprisonment* for any term less than one year and a fine of $1,000 on each of his convictions. (See Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—3(a)(1), 1005—9—1(a)(2).) However, noting that the crimes were not violent and that defendant did not have any prior convictions, the court concluded that incarceration was not warranted. Instead, defendant was given terms of probation to run concurrently and was not fined the maximum amount on any of his convictions for gambling. We cannot say that the court's sentence was excessive and an abuse of discretion.

Accordingly, for the reasons expressed above, the decision of the circuit court of Du Page County is affirmed.

Affirmed.

LINDBERG, P.J., and DUNN, J., concur.