THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ARGELIO ABREGO, Defendant-Appellant.

Second District   No. 2—85—0179

Opinion filed April 30, 1986.

Mary Robinson and Josette Skelnik, both of Robinson & Skelnik, of Elgin, and Jed Stone, of Waukegan, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Peter M. Tumminaro, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Argelio Abrego, was charged in a four-count information filed in the circuit court of Lake County with unlawful delivery of more than 15 grams of a substance containing heroin, unlawful delivery of more than 30 grams of a substance containing cocaine, and

two counts of armed violence relating to those two offenses. (Ill. Rev. Stat. 1983, ch. 56½, pars. 1401(a)(1), (a)(2); ch. 38, par. 33A—2.) A codefendant, Gerardo Carreno, was also charged with two unlawful deliveries, to which he subsequently pleaded guilty. A jury found the defendant guilty of all counts; he was sentenced to the Department of Corrections for 12 years on the heroin charge.

The defendant raises these issues in this appeal: (1) whether testimony by a government agent as to the substance of telephone conversations he had with a certain individual and his identification of that individual as the defendant should have been stricken due to the State's failure to lay a proper foundation for the admission of this evidence; (2) whether the trial court improperly admitted out-of-court statements made by codefendant Gerardo Carreno under the coconspirator exception to the hearsay rule; (3) whether the defendant's sentence of 12 years should be reduced because it is grossly disparate from the sentence imposed on his codefendant; and (4) whether the defendant's sentence of 12 years is excessive.

Before testimony was taken at trial, defense counsel made a motion *in limine* requesting that statements made by codefendant Gerardo Carreno in connection with the drug deliveries for which defendant was on trial be excluded from evidence. The State indicated that it intended to introduce Carreno's statements under the coconspirator exception to the hearsay rule. To that end, the State presented an offer of proof, with Richard Weil, a North Shore Metropolitan Enforcement Group (MEG) agent, and Cesar Palma, a Drug Enforcement Administration (DEA) agent, testifying on behalf of the State.

Agent Weil stated that on the evening of April 25, 1984, he was positioned at the far west end of a Shell gasoline station on Grand Avenue in Gurnee conducting surveillance in regard to an ongoing drug investigation. At 7:55 p.m., he observed a compact vehicle containing two male Latins drive into the station and park near the telephone, which was located at the east end of the station approximately 100 to 150 feet away from where he was located. The two men met with an individual named Larry Darnell, who was acting as a confidential informant in the investigation, and who had arrived at the station earlier.

During the next 10 to 20 minutes, agent Weil observed the two Latin men in the vicinity of the telephone. One man was very tall and bearded, and the other was very short. Weil identified the defendant as the tall man, and Gerardo Carreno was the short one. He stated that defendant was the person driving the compact car that evening,

and that a license plate check yielded the defendant's name. Agent Weil took notes of what he observed, using a tape recorder to record the events as they transpired. His notes reflected the defendant was on the telephone at 8:09 p.m. and that Carreno was on the phone at 8:11 p.m. Although he did not note it, he seemed to recall that Darnell talked on the phone also.

On that same evening, DEA agent Cesar Palma was stationed in Room 205 of the Holiday Inn in Gurnee, awaiting the delivery of 15 ounces of cocaine from Gerardo Carreno, with whom Palma had been negotiating previously. While in the room, Palma received a beep on his pager unit, which required him to make a telephone call back to the number shown on the pager. He responded to the page almost immediately. Although he testified on direct examination that he received the page between 7:30 and 8 p.m., he noted on cross-examination that his report indicated he received the page at 7:30 p.m. Palma acknowledged that he had been trained in making these reports and that the reports were to be accurate.

When Palma responded to the page, he spoke first with Larry Darnell, who told Palma he was in the company of Carreno and another male Mexican, and that he was across the street from the Holiday Inn at the Shell Station. Carreno then got on the telephone, and Palma spoke with him in Spanish. Carreno told Palma he had been unable to get the 15 ounces of cocaine. He added that the individual from whom he was getting the cocaine was with him. Carreno then put another individual, whom Palma did not know, on the telephone, and Palma had a narcotic-related conversation with him in Spanish.

Palma testified that he had another telephone conversation with this unknown individual again on April 26. On the 26th, he talked with him in person in the parking lot of the Holiday Inn, and, later yet on the 26th, he talked with him after this unknown individual was arrested and he was being processed at the Lake County jail. Palma testified he recognized the voice of the person in the April 26 conversation to be the same voice he spoke with on April 25; he identified the defendant in court as the man he arrested and with whom he had the telephone conversations.

Over objection Palma testified that during the April 25 phone call, the speaker, whom Palma had identified as the defendant, Abrego, told Palma they had trouble getting the 15 ounces of cocaine, but would have it ready the next day. Palma stated that would be fine. The speaker, Abrego, then said that he understood Palma was interested in purchasing heroin and indicated that he could supply up to a kilo of it. When Palma indicated that he was more interested in the

heroin than the cocaine, the speaker, Abrego, agreed to bring along some heroin on April 26.

Palma then spoke with Carreno again and expressed his anger at the fact that the delivery was not going to take place that day as planned. Carreno assured Palma that he could deliver the next day, and the call was then terminated.

On cross-examination, Palma testified he received a beep on his pager unit somewhere between 7:30 and 8 p.m., and responded to it as soon as he got an outside line. His report, prepared shortly after these events transpired, showed he received the page at 7:30 p.m. It did not take an extraordinary amount of time to get an outside line. He did not make notes of the events as they were transpiring. Prior to Abrego's arrest on the 26th, Palma testified Abrego had also said to him, "Ola" (Hello) and "He [meaning Carreno] has it."

The court denied the defendant's motion *in limine*, ruling that ample circumstantial evidence had been presented in the State's offer of proof to allow Carreno's statements to be admitted at trial under the coconspirator exception to the hearsay rule.

Both agents Weil and Palma testified again for the State at trial. Agent Weil's testimony was substantially the same as that given in the offer of proof. On cross-examination, Weil related again that he was not watching the Shell station or the telephone at the station during the entire time he was on surveillance on the evening of April 25. He agreed that it is possible that other people could have used the phone at some time without him noticing.

In addition to testifying to the same information as presented during the State's offer of proof, agent Palma testified further at trial as follows:

The next day, April 26, at 5:15 p.m., Palma was again contacted on his pager unit by the informant, Larry Darnell. Darnell told him that Carreno was having problems getting the narcotics as planned. Darnell arranged to meet with Palma at the Shell station at approximately 7 p.m. that evening. Carreno then got on the telephone and reiterated to Palma the problems he was having getting the drugs together. Carreno told Palma that he would meet him later in front of the hotel. During this conversation, Carreno advised Palma that the price would be two thousand dollars ($2,000) an ounce for the cocaine and eighteen hundred dollars ($1,800) an ounce for the heroin.

After this telephone conversation, Palma met with informant Darnell at the Shell station. Darnell advised Palma that Carreno would contact him at this station, and they remained at the station to await Carreno's phone call. Palma answered when Carreno called the

pay phone at the station. He told Palma that there had been a lot of police activity in the Waukegan area, and that because there was too much heat, he felt he would not be able to deliver the narcotics as planned. Palma agreed to put off the delivery and told Carreno to contact him within a week or so when he was ready to complete the transaction.

Palma told Darnell it looked like the deal was not going to go through that night, and then he left the area. Enroute to Chicago, Palma received a beep on his pager unit. It was about 8:20 or 8:30 p.m. He responded to the page, and Carreno answered the number which Palma dialed. Carreno, very excited, told Palma that everything was set up and the deal was ready to go. When Palma hesitated, Carreno said, "Wait a minute," and gave the phone to another individual, whom Palma stated he recognized as the same voice he had talked to on the phone the prior evening. This voice told Palma that the cocaine was already packaged and weighed and ready to go, and that they were waiting for the heroin to be weighed and packaged. Palma then agreed to the delivery and, after ending the phone call, renewed arrangements with the surveillance team.

Palma met with Darnell at the Shell station at 9:30 p.m. Darnell said Carreno had instructed that they were to wait at the station for his call. The phone rang at about 9:45 p.m., and Palma spoke with Carreno, who told him he was with the guy who had the stuff, everything was ready to go, and that he would be there in half an hour.

Palma left Darnell at the Shell station and returned to the Holiday Inn and stayed with the surveillance agents. About 10:15 p.m., he heard over the surveillance radio that a green Chevy had pulled into the Shell station. He went into the hotel to be near a phone, expecting to receive Darnell's page. Ten minutes later, no page had been received, so Palma drove across the street to the station. As he pulled in, he saw Abrego and Carreno standing by a green Chevrolet, Abrego by the driver's side and Carreno in the front by the passenger side. Palma motioned Carreno over to his car and told him to get inside. Palma asked Carreno if he had the cocaine and heroin. Carreno responded, "Yes, but we only have five ounces of cocaine and one ounce of heroin." When Palma asked: "Who is that guy?", pointing to the defendant, Carreno said, "He's the guy that's got the stuff." Palma told Carreno to go back to his car and follow him across the street and into the hotel. Carreno agreed, getting out of Palma's car and returning to the Chevy. With Abrego driving, the two men followed Palma across the street into the hotel parking lot.

When Palma got out of his car, he had a plastic bag and a small

black attache case containing $24,000 in United States currency. He went to the passenger side of the car where Carreno was sitting and greeted both men in Spanish. Abrego returned the greeting. Palma then looked at Abrego and asked, in Spanish, "Do you have the package?" Abrego responded, "He has it," pointing to Carreno. Palma suggested that they go inside the hotel to break up the package of money, since they had been dealing for more than was brought. Palma gave them a fictitious room number in the hotel because he did not have a room rented at that time. Palma looked at Carreno and said, "Why don't you put the narcotics inside the bag?", and he opened up the bag. Carreno reached into his coat pocket and placed three packages in the bag, two packages contained white powder, and one contained a brown powder. Palma took that bag and said, "Let's go into the hotel." Carreno and Abrego exited the car and started walking with Palma toward the hotel. Palma then gave a signal by transmitter to surveillance agents, and Carreno and Abrego were arrested.

Over a scope and hearsay objection by defense counsel, Palma was allowed on redirect examination to testify to an additional conversation he and Carreno had, on April 26, at the Holiday Inn. Palma testified that on that date, he unexpectedly met Carreno and Darnell at the hotel. Carreno said he was just looking the place over. Carreno told Palma he would be ready to deliver about 6:30 that evening and added, "The guy that has the narcotics is going to come with me." When Palma balked at this, Carreno reassured him, saying: "This guy has got the stuff; no problem." Palma confirmed that his first visual contact with the defendant was on the 26th, and that he had spoken with him twice before that on the telephone. He recognized the voice to be that of the same man he saw on the evening of the 26th: "Just [by] the sound of his voice. You talk to someone on the phone twice and it is the same person." Palma testified he had a conversation with the defendant on the 26th in person prior to his arrest, and after his arrest for between 35 and 40 minutes.

On re-cross-examination concerning his perception of the defendant's voice, Palma testified the defendant had a northeastern Mexican accent, but he had not made a note of that fact. He also did not note that Carreno had a Mexico City accent. Palma stated it was not the four words the defendant spoke to him in the parking lot of the Holiday Inn which caused him to conclude that the defendant was the same person he talked to on the telephone. Aside from the four words spoken to him in person by the defendant, Palma testified he had only spoken with him on the phone. Palma denied it was the conversation he had with the defendant subsequent to his arrest which convinced

him that the defendant was the same person that he was talking to on the phone, and denied it was the four words that convinced him.

On redirect examination immediately thereafter, the following colloquy occurred:

"Q. [Assistant State's Attorney Mullen] What convinced you?

A. [Palma] The identification of Agent Weil on the night of the 25th as the individual who talked to me on the phone, who was on the phone.

At the arrest of Mr. Abrego, he pointed out to me that Mr. Abrego was the same person as was on the phone.

MR. WILSON: [Defense counsel] Objection. I move to strike and ask the jury be instructed to disregard it.

(Whereupon the following proceedings were had in open court, outside the hearing of the jury.)

MS. MULLEN: He raised the question of how he knew. Now, we have the right to tell them how he knew. How he knew is the fact he just stated, the conversation he had subsequent to the incident.

THE COURT: He already testified to that before.

MR. WILSON: He already testified that nobody told him anything about that person, either.

THE COURT: I think this has already been out before the jury anyway, so I see no reason why there should be an objection at this time.

MR. WILSON: No, there wasn't. He testified that he talked to these people and nobody gave him the identification. All of this is coming after the arrest. It is hearsay, anyway.

THE COURT: I disagree. Overruled.

BY MS. MULLEN:

Q. Continuing then, you may answer. What convinced you *other than* your conversation with Weil? (Emphasis added.)

MR. WILSON: It's been asked and answered.

THE COURT: He already answered the question.

MS. MULLEN: Okay. Thank you then."

Upon his arrest, a loaded .357 Luger revolver was discovered in Abrego's front waistband, and a large number of .38-caliber bullets were found in his pants pockets. Evidence was received concerning the three packets of powder delivered of Palma. The packet of brown powder weighed 24.8 grams, and it contained 6.2% heroin hydrochloride. The two packets of white powder weighed a combined total of 133 grams and contained 68% cocaine hydrochloride. Carreno was called as a defense witness, but asserted his fifth amendment privi-

lege on the advice of his attorney and refused to answer any questions regarding whether the defendant had helped him deliver drugs to Cesar Palma on April 26, 1984.

### 1. VOICE IDENTIFICATION FOUNDATION

■ The defendant moved to strike Palma's testimony concerning Weil's visual identification of the defendant, thereby securing a ruling at trial. (*Cf. People v. Brown* (1982), 107 Ill. App. 3d 576 (counsel's failure to object to admission of evidence or move to strike it operated as waiver of any alleged error).) The issue was later raised and argued in post-trial proceedings and, thus, was preserved for review.

The defendant contends admission of Palma's testimony concerning the substance of Palma's alleged telephone conversations with him on April 25 and 26 was error because the State failed to show a proper foundation for voice identification. Defendant asserts Palma's identification of the telephone voice was not based on Palma's own independent determination that the voice was that of the defendant but, rather, it was based on the claim of agent Weil that the defendant was the person to whom Palma had spoken. As such, defendant asserts Palma's testimony regarding his identification of the voice and the substance of his conversations with the individual was incompetent and should have been stricken. Defendant argues Palma's identification of his voice could not have been based upon his personal acquaintance with him, since they were not acquainted, and—inasmuch as Palma denied it was the four words defendant spoke to him in person ("Ola" and "He has it") upon which he based his identification of the defendant—the remaining circumstantial evidence offered to prove the defendant was the other party in Palma's phone call was insufficient. Defendant points to the discrepancy between the time Palma received the page (7:30 p.m.) and the time Weil observed the defendant on the phone (8:09 p.m.). Defendant asserts the error in admitting the substance of the conversations was reversible and requires a new trial since evidence of the phone conversations was integral to the State's case. Absent evidence of the conversations, the defendant posits, the jury could have found he was merely present when the transaction occurred.

■ It is well established that telephone conversations which are relevant to the issues at trial are competent if a proper foundation has been laid. (*People v. Nichols* (1941), 378 Ill. 487, 490.) Testimony as to a telephone conversation between a witness and the accused is inadmissible in the absence of a claim by the witness that he knows the accused or could identify his voice, or in the absence of other evi-

dence or corroborative circumstances from which he might be identified as the person to whom the witness talked. (*People v. Poe* (1984), 121 Ill. App. 3d 457, 460-61; *People v. Metcoff* (1946), 392 Ill. 418.) With regard to such "other evidence or corroborative circumstances," "[t]he Illinois rule is liberal enough to allow identification of the voice after the telephone call. People v. Nichols, 378 Ill. 487, 38 N.E.2d 766 (1942)." *Hires v. Price* (1966), 75 Ill. App. 2d 202, 211.

It is clear agent Palma could not identify the defendant's voice on April 25 on the basis of his prior personal knowledge of it since he had not heard it before that time. The State seeks to discount Palma's after-acquired recognition of the defendant's voice, however, on the basis Palma denied it was the four words defendant uttered in the parking lot prior to his arrest which "convinced him" that defendant was the person he spoke to earlier.

Defendant points to Palma's statement that what "convinced him" that Abrego was the person to whom he spoke on the phone was "the identification of agent Weil on the night of April 25 as the individual who talked to me on the phone, who was on the phone. At the arrest of Mr. Abrego, he pointed out to me that Mr. Abrego was the same person as was on the phone."

The record is clear that Palma spoke with the defendant on two occasions other than his first contact with him on April 25 and other than the first four words he heard him speak in person; that is, by telephone on April 26 when it was discussed that the delivery would proceed as planned after all, and after his arrest when Palma secured defendant's necessary biographical data and understanding of his *Miranda* rights. Palma testified his first visual contact with the defendant was on April 26, and that he recognized the defendant's voice to be the same as the voice of the man he talked with twice before on the telephone. Thus, based on this record, it is apparent that Palma had an independent basis for his recognition of the voice. He was "convinced" the defendant had the same voice as the man he talked with on the phone twice before he made his first visual contact with the defendant on April 26 "just by the sound of his voice." Although Palma testified it was not a markedly unusual voice otherwise, he did note that the defendant had a northeastern Mexican accent, as opposed to Carreno's, which was a Mexico City accent. What "convinced" Palma that the *person* of the defendant was the same *person* who had been on the phone with him on April 25, however, was that agent Weil pointed out to him that the defendant was the same *person* as was on the phone on April 25. Weil's identification of the defendant was visual, as opposed to Palma's identification, which was

auditory.

■ It has been held that identification of a defendant by voice alone may establish a defendant's guilt beyond a reasonable doubt. (*People v. Lewis* (1983), 115 Ill. App. 3d 389, 397, *rev'd on other grounds* (1984), 103 Ill. 2d 111.) Further, it has been stated:

"A witness can learn and know facts by and through the exercise of his perceptive faculties,—his five senses,—and such facts he may state." *Ogden v. People* (1890), 134 Ill. 599, 601.

Based on this record, Weil's visual identification of the defendant, although it was corroborative of Palma's auditory identification, was not the *basis* for it as the defendant suggests, nor should it be regarded as operating to negate the value or reliability of Palma's independent auditory identification. Palma's testimony concerning his recognition of the defendant's voice as belonging to the same person he talked with twice before on the phone, and his in-court identification of the defendant as that person, provided a sufficient foundation for the admission of the substance of the telephone conversations.

## 2. COCONSPIRATOR EXCEPTION

■ The defendant argues evidence of Carreno's out-of-court statements implicating him were improperly admitted as hearsay which was not otherwise admissible under the coconspirator's exception to the hearsay rule.

A recent case decided by this court, *People v. Miller* (1984), 128 Ill. App. 3d 574, explains the coconspirator's declaration exception to the hearsay rule:

"Under this exception, the acts and declarations of a co-conspirator made in furtherance of the conspiracy are admissible against a defendant even when they are made out of the defendant's presence. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 945, 455 N.E.2d 733.) In order to avail itself of the coconspirator exception, it is not necessary for the State to charge the crime of conspiracy; the State is merely required to establish a *prima facie* case by independent evidence that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach another end by criminal means. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 945, 455 N.E.2d 733; *People v. Olmos* (1979), 77 Ill. App. 3d 287, 291, 395 N.E.2d 968.) The existence of the agreement, which is the essence of a conspiracy, need not be proved by direct evidence, but may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the accused.

(*People v. Columbo* (1983), 118 Ill. App. 3d 882, 945, 455 N.E.2d 733; *People v. Olmos* (1979), 77 Ill. App. 3d 287, 291, 395 N.E.2d 968.) Finally, statements made in furtherance of a conspiracy are those which had the effect of advising, encouraging, aiding or abetting its perpetration. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 948, 455 N.E.2d 733; *People v. Olmos* (1979), 77 Ill. App. 3d 287, 292, 395 N.E.2d 968.)" 128 Ill. App. 3d 574, 584-85.

Since we have determined that the phone conversations between agent Palma and the defendant were properly admitted, their substance alone establishes a *prima facie* case of conspiracy between the defendant and Carreno to deliver drugs to Palma, and evidence of Carreno's out-of-court statements implicating the defendant were properly admitted.

On the occasion of Palma's first conversation with the defendant, Carreno had spoken with Palma on the phone immediately before the defendant got on the line. The defendant told Palma:

"[T]hey had trouble getting the 15 ounces of cocaine, but *they* would have it ready for the next day, the 26th. I [Palma] said that would be fine. He [the defendant] said, 'I understand that you are interested in purchasing or buying heroin.' I told him that I was. And he said, 'I can supply you with up to a kilo of heroin.' I said I was more interested in the heroin than the cocaine. And he said, 'Why don't I bring some to you tomorrow?' I then said, 'Bring it with the cocaine.' And he said, 'Fine.'

I then talked to Carreno again." (Emphasis added.)

In the second conversation with Abrego on April 26, Palma again had just spoken with Carreno on the phone, and then the defendant spoke on the phone saying:

"[T]hat *they* had got the cocaine together, that everything was ready to go.

\* \* \*

He [Abrego] told me [Palma] that the cocaine was already, packaged and ready to go, and *they* were waiting for the heroin to be weighed and packaged. He said that the problem had been that the guy that had the stuff had been at work and he had just gotten home. I said, 'Fine.'

He then passed the phone over to Mr. Carreno again and I told Mr. Carreno that I would be in contact with him." (Emphasis added.)

Later that same evening, with Abrego driving and Carreno as a passenger, Palma received the delivery of cocaine and heroin, and

Carreno and the defendant were arrested. A loaded revolver was recovered from the front waistband of the defendant's pants and more bullets were found in his pocket.

This evidence clearly shows the defendant and Carreno shared the common objective to deliver cocaine and heroin to Palma. As such, a *prima facie* case of conspiracy was established, and Carreno's out-of-court statements implicating the defendant were admissible under the coconspirator exception to the hearsay rule.

### 3. Sentence Disparity

The defendant contends that the disparity between his 12-year sentence and the six-year sentence of his codefendant, Gerardo Carreno, is unjustified by either his background or the nature of his participation in the offenses. He requests that it be reduced to one commensurate with that received by Carreno.

Carreno pleaded guilty to both Class X delivery offenses (heroin and cocaine) in exchange for a sentence of not more than nine years. The minimum sentence of six years for a Class X offense was imposed, after the court noted the great remorse exhibited by Carreno and that it appeared that Abrego was the more serious culprit.

■ It has been held that a sentence imposed as the result of a negotiated guilty plea does not provide a valid basis of comparison for a sentence imposed after trial. (*People v. White* (1985), 134 Ill. App. 3d 262, 283; *People v. White* (1984), 122 Ill. App. 3d 24, 38-39; *People v. Maxwell* (1985), 130 Ill. App. 3d 212, 219; *People v. Bennett* (1980), 90 Ill. App. 3d 64.) The defendant argues that the State's reliance on *Bennett* for this proposition is misplaced, though, because the defendant there was sentenced on an unrelated, lesser charge than his codefendant, whereas both defendants here were convicted of Class X offenses.

■ The instant cause provides a clear example of why a negotiated plea sentence provides no valid basis for comparison with the sentence imposed after trial; to-wit: in this case, the length of the sentence to be imposed was actually the underlying consideration for the agreement. Carreno agreed simply to plead guilty to the two Class X offenses in exchange for a sentence not to exceed nine years. Carreno did not agree to, nor did he, testify against the defendant. The State did not reduce or dismiss any charges against him. That the court imposed the minimum six-year sentence as opposed to the possible nine years under the agreement is attributable to what the court considered to be mitigating factors.

■ Contrary further to the defendant's argument, the record

clearly shows Carreno was not "similarly situated" to the defendant. Carreno was not the drug supplier. Agreed, the record shows that Abrego was also not the primary supplier, and that he obtained the drugs from yet another party. Surely, however, this fact simply bolsters the conclusion that Carreno was removed one step further down the supply and distribution chain than Abrego. Moreover, Abrego was charged with and convicted of two counts of armed violence, and the fact the weapon was not used or apparently not even attempted to be used is irrelevant to a conviction under that statute. (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2.) The defendant was armed; his conduct implicitly imposed a threat of serious harm (see *People v. Smith* (1985), 132 Ill. App. 3d 857, 861), and a threat of serious harm is an aggravating factor under section 5—5—3.2(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(a)(1)). At sentencing the court gravely considered the defendant's obvious readiness to engage in violence due to the fact he was armed and was amply armed with bullets.

In sum, we find no unjustified disparity in the defendant's sentence and, therefore, no basis for its reduction.

### 4. EXCESSIVE SENTENCE

■ At sentencing, the State requested the defendant be sentenced to 15 years in the Department of Corrections; the court imposed a 12-year term. Defendant's motion to reconsider the sentence imposed was heard and denied. Defendant now contends here that the court's sentence is excessive and constitutes an abuse of discretion.

He argues the trial court "made no mention of the various positive factors weighing against a sentence in excess of the minimum." Instead, the defendant notes "the judge focused in on 1) the nature of the offense and 2) the need for deterrence of other individuals."

Both objects of the judge's "focus" are proper considerations in aggravation of sentencing. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—5—3.2(a)(1), (2), (7).) Further, it has been held that where mitigating evidence is before the court, as it was here, it is presumed that the sentencing judge considered the evidence, absent some indication, other than the sentence imposed, to the contrary. (*People v. Danis* (1984), 129 Ill. App. 3d 664; *People v. Moorhead* (1984), 128 Ill. App. 3d 137; *People v. Bergman* (1984), 121 Ill. App. 3d 100.) Moreover, where a sentencing judge articulates factors in aggravation, as in the instant case, a court of review may assume the trial judge properly considered factors in mitigation. *People v. Bergman* (1984), 121 Ill. App. 3d 100, 109.

The record reveals no abuse of the court's discretion which would warrant a reduction of the defendant's sentence.

The judgment of the circuit court of Lake County is affirmed.

Judgment affirmed.

LINDBERG and SCHNAKE, JJ., concur.